## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF INDIANA
## INDIANAPOLIS DIVISION

| | | |
|---|---|---|
| SAMUEL C. ARP II, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Case No. 1:21-cv-02626-TWP-MKK |
| | ) | |
| INDIANA STATE POLICE, | ) | |
| DOUGLAS G. CARTER Superintendent, in his | ) | |
| individual and official capacities, | ) | |
| CHARLES SORRELLS in his individual and | ) | |
| official capacities, | ) | |
| TODD SMITH Major, in his individual and | ) | |
| official capacities, | ) | |
| MICHAEL WYLIE Captain, in his individual | ) | |
| and official capacities, | ) | |
| | ) | |
| Defendants. | ) | |

## ORDER ON CROSS-MOTIONS FOR SUMMARY JUDGMENT

This matter is before the Court on cross-motions for summary judgment filed by Plaintiff Samuel C. Arp. II ("Arp") (Filing No. 80) and Defendants Indiana State Police ("ISP"), Douglas G. Carter ("Superintendent Carter"), Charles Sorrells ("Major Sorrells"), Todd Smith ("Major Smith"), and Michael Wylie ("Captain Wylie") (collectively, "Defendants") (Filing No. 84). Arp, a former Indiana State Trooper who was injured in the line of duty, initiated this action alleging both federal and state law claims, after his separation from ISP and the termination of his long-term disability benefits. For the reasons explained below, Arp's Motion for Summary Judgment is **denied**, and Defendants' Cross-Motion is **granted in part and denied in part**, and Arp's state law claims are **remanded** to state court.

## I.      BACKGROUND

The following facts are not necessarily objectively true, but as required by Federal Rule of Civil Procedure 56, the facts are presented in the light most favorable to the non-moving party.

*See Zerante v. DeLuca*, 555 F.3d 582, 584 (7th Cir. 2009); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986). This background section is not intended to provide a comprehensive explanation of all the facts of this case, rather only the relevant factual circumstances are described.

**A.** **Arp's Employment with ISP, On-Duty Injury, and Long-Term Disability Benefits**

Arp began his employment as an ISP trooper in 2000 (Filing No. 83 at 12; Filing No. 86 at 15). In 2006, while serving as an ISP trooper, he was struck by a drunk driver while on duty and sustained extensive back injuries (Filing No. 83 at 12). Due to his injuries, Arp could no longer serve as an ISP trooper, and in 2008, ISP formally classified him as disabled (Filing No. 83 at 12–13; Filing No. 86 at 16).[1] Arp's long-term disability status became permanent in 2009, and ISP began paying him long-term disability pension benefits under the ISP Pension Trust Agreement (the "Trust Agreement") and Supplemental Trust Agreement (the "Supplemental Agreement") (together, the "Trust Agreements") (Filing No. 83 at 13).

ISP is an Indiana state agency which provides individuals with pension benefits through pension funds administered under the Trust Agreements, which are governed by Indiana law (Filing No. 83 at 4; Filing No. 86 at 9, 12). The Supplemental Agreement establishes ISP's Police Benefit Fund and Employee Death and Disability Fund (Filing No. 83 at 4). Among other things, the Supplemental Agreement provides long-term disability pension benefits to ISP employees who incur a disabling injury in the line of duty. *Id.* at 4.

The Supplemental Agreement provides three types of disability benefits at issue in this case: (1) a monthly disability benefits payment, with an additional stipend for dependents in some circumstances; (2) reimbursement of medical expenses associated with treatment of the disability;

---

[1] The parties dispute at length the specifics of Arp's employment status after he became disabled, including whether Arp was a "sworn" employee, whether he was a "regular police employee," and whether he was an "employee" at all under the various Trust Agreements, statutes, and policies at issue. The Court will not recount these disputed facts, as they are not material to the Court's analysis.

and (3) payment of insurance premiums (together, the "LTD Benefits").  *Id.* at 5.  The respective

provisions of the Supplemental Agreement regarding each of those benefits state, in relevant part:

> **3.     Performance of Duty Disability – 1987 Benefit System**:  In the event *an Employee* . . . incurs a disability through the performance of duty . . . the Employee shall be entitled to receive monthly payments from the Police Benefit Fund which . . . shall continue until the earliest of: (1) the date disability no longer exists, (2) the date death occurs, *(3) the date retirement occurs*, or (4) the later of the date the Employee is credited with twenty-five (25) years of Service with the Department . . . .
>
>          In the event an Employee shall become totally disabled in the performance of duty . . . he shall, in addition to the monthly disability pension payment provided for herein, and for the same period as such payment, receive from the Police Benefit Fund forty dollars ($40) per month for each dependent parent and each dependent minor child less than eighteen (18) years of age. . . .
>
> **29.     Performance of Duty Disability Medical Expense Reimbursements**:  In the event an Employee . . . incurs a disability through the performance of duty . . . the Employee or the Employee's beneficiary or estate shall be entitled to receive reimbursement for all travel, medical, surgical and hospital expenses directly resulting from such disability incurred before the Employee's death. . . .
>
> **31.     Life and Health Coverage while Disabled**:  Premiums for basic supplemental life, medical, vision, and dental insurance premiums maintained for disabled Employees through the Indiana State Police Health Care Plan and Life Insurance Plan shall be paid from the Police Benefit Fund, pursuant to the insurance policies and programs. . . .

(Filing No. 56-2 at 7, 17, 19 (emphasis added)). The Supplemental Agreement incorporates the

definitions in the Trust Agreement, which defines "Employee" as:  any regular police employee of

the Department. . . . The term "Employee" shall also include any such employee while in disability

status, as determined by the Pension Advisory Board.  (Filing No. 56-1 at 9.)[2]

The Trust Agreement further specifies when an 'Employee" is deemed to have retired and

is no longer an "Employee" for purposes of the Trust Agreements:

---

[2] The Trust Agreement also defines "Employee" to include any "regular limited police employee" hired by ISP before July 1, 1975 (Filing No. 56-1 at 9). References to "regular limited police employee" are immaterial because Arp became an ISP employee in 2000.

> *Once an Employee in disability status is retired* pursuant to the rules and regulations of the Department, *the Employee shall be deemed to have retired* for purposes of this Trust Agreement and the Supplemental Trust Agreement. *When an Employee otherwise ceases to be a regular police employee* . . . pursuant to the rules and regulations of the Department, *the Employee shall be deemed to have retired* or separated solely for purposes of this Trust Agreement and the Supplemental Trust Agreement and shall no longer be an Employee as defined in this Trust Agreement.
>
> *Id.* at 9 (emphasis added).

**B.      Arp's Election as Prosecutor and Correspondence with ISP**

In 2012, Arp notified ISP of his intention to attend law school, and in 2017, he graduated from law school (Filing No. 83 at 13). Shortly thereafter, Arp spoke with Major Smith, who had served as ISP's Chief Legal Counsel since 2007. *Id.* at 2, 14. Arp asked about the possibility of joining ISP's legal division, but Major Smith concluded that Arp was never "going to be able to come back to [ISP]." *Id.* at 14. During that discussion, Arp recalls raising the possibility of his candidacy for prosecutor, and Major Smith did not advise Arp that ISP would terminate his LTD Benefits if he were elected. *Id.* at 14. Defendants dispute that Arp and Major Smith discussed Arp's candidacy, and Major Smith testified that if the conversation had occurred, he would have informed Arp that he would need to separate from ISP if elected prosecutor (Filing No. 86 at 4).

Arp subsequently decided to run for Lawrence County Prosecutor, which is a full-time elected position (Filing No. 83 at 16). Arp asserts that, at the time, he did not have access to ISP's current Standard Operating Procedures ("SOPs") or other internal policies, which govern ISP's employees (Filing No. 83 at 14; Filing No. 86 at 5). Defendants dispute Arp's assertion that he did not have access to the SOPs and contend that they are available to any police trooper, including troopers on disability (Filing No. 86 at 3–4).

Arp first notified ISP of his intent to run for Lawrence County Prosecutor in 2018, when he requested permission to use his ISP photograph in his candidacy (Filing No. 81 at 43). Arp was directed to Captain Wylie. *Id.* at 40. Captain Wylie served in ISP's Human Resources division

between 2006 and 2021, and beginning in 2012, Captain Wylie oversaw ISP's Benefits section and supervised ISP's administration of insurance, pension, and other benefits  (Filing No. 83 at 3).  In March 2018, Arp had a telephone call with Captain Wylie. During the call, Arp disclosed his candidacy, and Captain Wylie directed Arp to send him a written request to use the ISP photograph, which Arp did (Filing No. 83 at 14–15; Filing No. 86 at 17–18). Captain Wylie did not direct Arp to complete any other ISP paperwork related to his request to run for office (Filing No. 83 at 14). The parties dispute whether, during this call, Captain Wylie informed Arp that he would be required to separate from ISP before assuming office, pursuant to ISP regulations (Filing No. 86 at 4).

Following the call, Captain Wylie completed an internal router to seek Superintendent Carter's approval of Arp's request to use his ISP photo for his candidacy. *Id.* at 15. Superintendent Carter has served as ISP's chief administrative officer since 2013. He has ultimate authority over all ISP employees and is responsible for overseeing ISP's Pension Advisory Board, which administers the Trust Agreements. *Id.* at 2, 4. The router to Superintendent Carter disclosed that Arp was intending to run for Lawrence County Prosecutor. *Id.* Colonel Mark French, as a proxy for Superintendent Carter, approved Arp's request (Filing No. 83 at 15; Filing No. 86 at 18). Captain Wylie notified Arp that his request was approved and provided him with a copy of his ISP photograph (Filing No. 83 at 15).

Throughout the rest of 2018, Arp communicated with Major Sorrells regarding his candidacy.  *Id.* at 15. Major Sorrells has worked for ISP since 1991 and has served as ISP's Assistant Chief of Staff of Human Resources and Administration since 2013. *Id* at 3. Major Sorrells did not advise Arp that he needed to complete any additional ISP paperwork related to his candidacy, but after consulting Superintendent Carter, Major Sorrells directed Arp to seek an ethics

opinion from the Indiana Inspector General's ("IG") office regarding his candidacy.  *Id.* at 16.  ISP

will sometimes seek input from the IG's office regarding requests to seek non-ISP employment,

but ISP's policies do not require individuals to seek opinions from the IG's office before running

for office. *Id.* at 10.

Arp contacted the Indiana State Ethics Director about the lawfulness of his candidacy for

Prosecutor and continued receipt of LTD Benefits.  *Id.* at 16.  Once the Ethics Director responded

to Arp's inquiry, Arp exchanged additional correspondence with Major Sorrells. Major Sorrells

then directed Arp to submit a second inquiry to the Ethics Director seeking additional guidance on

Arp's potential election and its effect on his LTD Benefits.  *Id.* at 16.

On November 6, 2018, Arp was elected Lawrence County Prosecutor, with his term set to

begin on January 1, 2019 (Filing No. 86 at 16, 19). It is undisputed that Arp was the first ISP

employee on long-term disability to be elected to full-time public office (Filing No. 83 at 16; Filing

No. 86 at 2).  Two days after his election, on November 8, 2018, Arp received the Ethics Director's

response to his second inquiry.  On November 9, 2018, Arp sent an email to Major Sorrells

notifying him of his election and containing the Ethics Director's response (Filing No. 83 at 16;

Filing No. 86 at 18). On November 27, 2018, after having received no response from Major

Sorrells, Arp sent a second email asking whether Major Sorrells could "advise any further." (Filing

No. 83 at 17.)

Later that day, without responding to either of Arp's emails, Major Sorrells forwarded the

November 9, 2018 email to Major Smith and requested legal guidance as to whether Arp could

continue receiving LTD Benefits following his election (Filing No. 81-9; Filing No. 86 at 18).

Majors Sorrells and Smith then met in person, and because "ISP's pension benefits, including the

Trust Agreements, are 'not an area of practice' for ISP's legal division" Major Smith referred Major

Sorrells to ISP's outside legal counsel at Ice Miller LLP ("Ice Miller") (Filing No. 83 at 4). ISP's internal legal department "relies heavily on Ice Miller with everything associated with [its] pension" (Filing No. 86 at 18). However, Major Sorrells did not reach out to Ice Miller until December 5, 2018, after Arp sent a third email to Major Sorrells "to follow up to see where [he] stood" (Filing No. 83 at 18). Superintendent Carter also discussed Arp's candidacy and Ice Miller's opinion with the Indiana Governor's office. *Id.* On December 12, 2018, Major Sorrells received a Memorandum from Ice Miller containing its legal analysis (Filing No. 86 at 18).

**C.     Arp's Separation from ISP and the Termination of Arp's LTD Benefits**

After ISP received the Memorandum from Ice Miller, Majors Sorrells and Smith discussed the findings with Superintendent Carter (Filing No. 86 at 19). Majors Sorrells and Smith were involved in ISP's ultimate decision regarding Arp's separation from ISP and the termination of his LTD Benefits (Filing No. 83 at 18). The parties dispute whether Captain Wylie was involved in the decision (Filing No. 86 at 4). However, it is undisputed that ultimate decision-making authority rested with Superintendent Carter, who approved the decision to separate Arp from ISP and terminate his LTD Benefits (Filing No. 83 at 18; Filing No. 86 at 19).

ISP based its decision on Indiana Code § 10-11-2-12, which governs ISP and its employees, and states: "If elected to other than a part-time local elected office, the employee or appointee shall resign as an employee or appointee before assuming elected office." Ind. Code § 10-11-2-12(d); (Filing No. 86 at 21). ISP also cited ISP Regulation 6(E)(1)(b), which is based on the statute, and provides: "If elected or appointed to a position other than a part-time local elected office the employee shall separate employment from [ISP] and be off [ISP] payroll before assuming the office." (Filing No. 81-4 at 7; Filing No. 86 at 8.)

Major Sorrells directed Captain Wylie to communicate ISP's decision to Arp (Filing No. 83 at 19; Filing No. 86 at 19). On December 18, 2018, Captain Wylie called Arp to inform him

that ISP would be terminating his LTD Benefits if he took office as Lawrence County Prosecutor. (Filing No. 83 at 19; Filing No. 86 at 19). Arp expected that one of the ISP officials would have notified him as soon as they identified a conflict, if any, between his continued receipt of LTD Benefits and his election as Lawrence County Prosecutor (Filing No. 83 at 19).  But Arp first heard of such a conflict during the December 18, 2018 call from Captain Wylie.  *Id.*

Immediately following Captain Wylie's call, Arp's attorney sent a letter to Superintendent Carter, copying Major Sorrells, asking ISP for its written position on Arp's LTD Benefits (Filing No. 85-6).  ISP did not respond to the letter from Arp's attorney.  Instead, on December 20, 2018, Major Sorrells sent an email to Arp attaching a memorandum provided at Arp's "request for written follow up pertaining to [his] conversation with Captain Wylie" (Filing No. 81-16; Filing No. 86 at 20). The memorandum stated that Regulation 6(1)(E)(b) "per statutory authority" governed the issue, and that "in accordance with Regulation 6(1)(E)(b), [Arp's] separation shall be completed prior to [him] assuming [his] elected role as the Lawrence County Prosecutor on January 1, 2019" (Filing No. 81-11).  The memorandum also stated that "Senior Pension Administrator Laurie Hardin [would be] available to facilitate [Arp's] separation at [his] earliest convenience no later than December 31, 2018." *Id.*

On December 27, 2018, Arp's attorney sent a second letter to Superintendent Carter, stating that he had advised Arp to "stand down" to any request by ISP to resign, and that Arp reserved "the right to make claim" to any stopped disability pension payments (Filing No. 85-7).

On December 31, 2018, in the same email thread as his December 20, 2018 email, Major Sorrells again emailed Arp and stated:

> I am informed that you have not initiated your resignation with Senior Pension Administrator Laurie Hardin as was requested in the email and attachment below sent to you on December 20, 2018. . . .

If your resignation is not received prior to midnight December 31, 2018 (end of the calendar year) we will assume you have resigned to accept the elected position as Lawrence County Prosecutor and process accordingly. . . .

([Filing No. 81-16](#)).

On January 2, 2019, Senior Pension Administrator Laurie Hardin directed another ISP employee to terminate Arp's LTD Benefits effective December 31, 2018, even though Arp had not communicated to ISP that he intended to resign ([Filing No. 83 at 20](#)). ISP then terminated all of Arp's LTD Benefits, except his medical expense reimbursement benefit, effective December 31, 2018 ([Filing No. 56-2 at 17](#); [Filing No. 83 at 21](#); [Filing No. 86 at 20](#)).[3]

On January 8, 2019, Major Sorrells advised Arp that ISP assumed he had resigned, had already terminated his insurance premium benefit effective December 31, 2018, and would be terminating his other LTD Benefits effective December 31, 2018 ([Filing No. 83 at 21](#)).  ISP did not provide Arp with any written charges or an opportunity for a hearing before it deemed him to have resigned and terminated his LTD Benefits. *Id.* at 21. ISP asserts that the disciplinary process and procedures referred to by Arp relate only to employee terminations, not resignations or separations, as Defendants argue is the case here ([Filing No. 86 at 6](#)).

**D.**   **Procedural History**

Arp initiated this action in the Marion Superior Court 5 on November 27, 2019 ([Filing No. 1-2 at 2](#)). His initial Complaint asserted state law claims and a § 1983 claim against ISP. *Id.* at 24–29. On September 1, 2021, Arp moved for leave to amend his Complaint to add Superintendent Carter, Major Sorrells, Major Smith, and Captain Wylie (together, the "ISP Officials") as defendants. The state court granted the motion, and on September 14, 2021, Arp filed his Amended Complaint. On October 13, 2021, Defendants removed this action to this court on the basis of

---

[3] When the Court hereinafter refers to ISP's termination of Arp's "LTD Benefits," the Court is referring to all LTD Benefits except the medical expense reimbursement benefit, which the parties agree was not terminated.

federal question jurisdiction created by Arp's § 1983 claim (Filing No. 1 at ¶ 10). Defendants then moved to dismiss the § 1983 claim (Filing No. 8).  The Court granted in part and denied in part Defendants' motion and granted Arp leave to file a second amended complaint. On September 12, 2022, Arp timely filed a Second Amended Complaint, which is the operative pleading in this action (Filing No. 56). The Second Amended Complaint asserts Count I – Unlawful Termination of Employment; Count II – Breach of Contract; Count III – Unlawful Termination of Benefits; Count IV – Breach of Fiduciary Duty; Count V – Violation of Article I, § 12 of Indiana Constitution; Count VI – Violation of Due Process Clause of United States Constitution (under 42 U.S.C. § 1983); and Count VII – Specific Performance. *Id.*

On March 6, 2023, Arp moved for  summary judgment (Filing No. 80), and on April 6, 2023, Defendants filed a cross-motion seeking summary judgment on all claims. (Filing No. 84).

## II.   SUMMARY JUDGMENT STANDARD

The purpose of summary judgment is to "pierce the pleadings and to assess the proof in order to see whether there is a genuine need for trial." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986). Federal Rule of Civil Procedure 56 provides that summary judgment is appropriate if "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." *Hemsworth v. Quotesmith.com, Inc.*, 476 F.3d 487, 489–90 (7th Cir. 2007).  In ruling on a motion for summary judgment, the court reviews "the record in the light most favorable to the non-moving party and draw[s] all reasonable inferences in that party's favor." *Zerante*, 555 F.3d at 584 (citation omitted). "However, inferences that are supported by only speculation or conjecture will not defeat a summary judgment motion." *Dorsey v. Morgan Stanley*, 507 F.3d 624, 627 (7th Cir. 2007) (citation and quotation marks omitted). Additionally, "[a] party who bears the burden of proof on a

particular issue may not rest on its pleadings, but must affirmatively demonstrate, by specific factual allegations, that there is a genuine issue of material fact that requires trial." *Hemsworth*, 476 F.3d at 490 (citation omitted). "The opposing party cannot meet this burden with conclusory statements or speculation but only with appropriate citations to relevant admissible evidence." *Sink v. Knox Cnty. Hosp.*, 900 F. Supp. 1065, 1072 (S.D. Ind. 1995) (citations omitted).

"In much the same way that a court is not required to scour the record in search of evidence to defeat a motion for summary judgment, nor is it permitted to conduct a paper trial on the merits of [the] claim." *Ritchie v. Glidden Co.*, 242 F.3d 713, 723 (7th Cir. 2001) (citations and quotation marks omitted). "[N]either the mere existence of some alleged factual dispute between the parties nor the existence of some metaphysical doubt as to the material facts is sufficient to defeat a motion for summary judgment." *Chiaramonte v. Fashion Bed Grp., Inc.*, 129 F.3d 391, 395 (7th Cir. 1997) (citations and quotation marks omitted).

These same standards apply even when each side files a motion for summary judgment. The existence of cross-motions for summary judgment does not imply that there are no genuine issues of material fact. *R.J. Corman Derailment Serv., LLC v. Int'l Union of Operating Eng'rs*, 335 F.3d 643, 647 (7th Cir. 2003). The process of taking the facts in the light most favorable to the non-moving party, first for one side and then for the other, may reveal that neither side has enough to prevail without a trial. *Id.* at 648. "With cross-motions, [the Court's] review of the record requires that [the Court] construe all inferences in favor of the party against whom the motion under consideration is made." *O'Regan v. Arb. Forums, Inc.*, 246 F.3d 975, 983 (7th Cir. 2001) (citation and quotation marks omitted).

### III.    <u>DISCUSSION</u>

Both parties seek judgment as a matter of law on all of Arp's claims. Subject matter jurisdiction rests on Arp's § 1983 claim (<u>Filing No. 1</u>), accordingly, the Court will address that

claim first. Because, for the reasons discussed below, Defendants are entitled to judgment as a matter of law on Arp's § 1983 claim, the Court will subsequently discuss whether it should retain supplemental jurisdiction over Arp's remaining state law claims.

### A.   Arp's § 1983 Claim

Arp's alleges the ISP Officials—acting under color of law—violated the Due Process Clause of the Fourteenth Amendment of the United States Constitution by failing to provide meaningful notice and an opportunity to be heard before termination of his employment and termination of his LTD benefits (Filing No. 56 at ¶¶ 135–137).[4]   The Fourteenth Amendment establishes that "[n]o State shall . . . deprive any person of life, liberty, or property, without due process of law . . . ." U.S. Cont. amend. XIV. In a procedural due process claim, the deprivation by the state of a constitutionally protected interest in "life, liberty, or property" is not in and of itself unconstitutional; what is unconstitutional is the deprivation of such an interest without due process of law. *Brokaw v. Mercer Cnty.*, 235 F.3d 1000, 1020 (7th Cir. 2000). Procedural due process claims involve "a two-step inquiry: (1) whether the defendants deprived the plaintiff of a constitutionally protected liberty or property interest; and (2) if so, whether that deprivation occurred without due process of law." *Doe v. Heck*, 327 F.3d 492, 526 (7th Cir. 2003), *as amended on denial of reh'g* (May 15, 2003) (quoting *Zinermon v. Burch*, 494 U.S. 113, 125 (1990)).

Arp asserts that he had a protected property interest in his employment status with ISP and in his LTD benefits (Filing No. 83 at 32).   In their response, Defendants do not dispute (though they do not admit, either) that Arp had a protected interest in his employment status and LTD

---

[4] Though Arp does not expressly state whether he is alleging a substantive or procedural due process claim, his allegations in the Second Amended Complaint and his summary judgment briefing make clear he is asserting a procedural due process claim (Filing No. 56 at ¶ 135; Filing No. 83 at 32–34).

benefits, or that Arp was deprived of those interests without process (Filing No. 86 at 32).  Instead, they argue they are entitled to qualified immunity (Filing No. 86 at 32).

To overcome Defendants' qualified immunity defense, Arp must show: (1) that his constitutional rights would have been violated on the facts alleged; and (2) those rights were "clearly established" at the time of the alleged misconduct.  *See, e.g.*, *Ashcroft v. al-Kidd*, 563 U.S. 731, 741 (2011); *Chelios v. Heavener*, 520 F.3d 678, 691 (7th Cir. 2008).  Often, courts address the first prong of this test before the second, as "the first prong . . . is intended to further the development of constitutional precedent," but "opinions following that procedure often fail to make a meaningful contribution to such development."  *Pearson v. Callahan*, 555 U.S. 223, 237 (2009).  "For one thing, there are cases in which the constitutional question is so factbound that the decision provides little guidance for future cases. . . . A constitutional decision resting on an uncertain interpretation of state law is also of doubtful precedential importance."  *Id.* at 237–38.  As a result, "there will be cases in which a court will rather quickly and easily decide that there was no violation of clearly established law before turning to the more difficult question whether the relevant facts make out a constitutional question at all."  *Id.* at 239.  This is one of those cases, so the Court will first address whether the asserted rights at issue were "clearly established."

"Under the clearly established prong, 'the burden is on plaintiffs to demonstrate the alleged violation of their [constitutional] right[s] was "clearly established."'" *Reed v. Palmer*, 906 F.3d 540, 547 (7th Cir. 2018) (alterations in original). "A right is 'clearly established' when it is 'sufficiently clear that every reasonable official would have understood that what he is doing violates that right.'" *Lovett v. Herbert*, 907 F.3d 986, 992 (7th Cir. 2018) (quoting *Mullenix v. Luna*, 577 U.S. 7, 12 (2015) (quotation marks omitted)). The difficulty in determining whether a right is clearly established is defining the right in question. *Becker v. City of Evansville*, No. 12-

cv-182, 2015 WL 328895, at *21 (S.D. Ind. Jan. 26, 2015); *see Kemp v. Liebel*, 877 F.3d 346, 351 (7th Cir. 2017) ("Before we can determine if the law was clearly established, 'the right allegedly violated must be defined at the appropriate level of specificity.'" (quoting *Wilson v. Layne*, 526 U.S. 603 (1999))). "The Supreme Court has 'repeatedly told courts . . . not to define clearly established law at a high level of generality,' and the Seventh Circuit has long held that 'the test for immunity should be whether the law was clear in relation to the specific facts confronting the public official when he acted.'" *Volkman v. Ryker*, 736 F.3d 1084, 1090 (7th Cir. 2013) (citing *al-Kidd*, 563 U.S. at 742; *Colaizzi v. Walker*, 812 F.2d 304, 308 (7th Cir. 1987)).

With respect to his employment status, Arp contends that the law clearly established that ISP was obligated to afford him meaningful notice and an opportunity to be heard before terminating him (Filing No. 90 at 33). Arp argues that "no intricate analysis of previously announced case law is required" because Indiana law plainly and clearly establishes the procedures that ISP must follow to terminate an individual's employment. *Id.* But Arp too broadly defines the right at issue. Considering the specific facts of this case, the Court must determine whether as of January 1, 2019, the law was clearly established that deeming an employee to have resigned once that employee becomes required by law to resign is a form of involuntary termination that entitles the employee to pre-termination process and procedures.

Whether the law had clearly established that Arp's "resignation" was involuntary or voluntary is essential to the Court's analysis because an employee who is involuntary terminated is entitled to process, but an employee who voluntarily resigns is not. *See Palka v. Shelton*, 623 F.3d 447, 453 (7th Cir. 2010) ("A public employee who voluntarily resigns cannot complain about a lack of due process, but an 'involuntary' resignation may in certain circumstances form the basis of a due-process claim.").

14

This Court will first look to see if the law has been clearly established by controlling precedent from the Supreme Court and Seventh Circuit Court of Appeals. *Jacobs v. City of Chicago*, 215 F.3d 758, 767 (7th Cir. 2000). If no controlling precedent exists, "we broaden our survey to include all relevant caselaw in order to determine 'whether there was such a clear trend in the caselaw that we can say with fair assurance that the recognition of the right by a controlling precedent was merely a question of time.'" *Id.* (quoting *Cleveland-Perdue v. Brutsche*, 881 F.2d 427, 431 (7th Cir. 1989)); *see also al-Kidd*, 563 U.S. at 742 (requiring a "robust consensus of cases of persuasive authority" (quotation marks omitted)).

Alternatively, in "rare cases, where the constitutional violation is patently obvious, the plaintiffs may not be required to present the court with any analogous cases." *Jacobs*, 215 F.3d at 767. In those cases, "plaintiffs can demonstrate clearly established law by proving the defendant's conduct was 'so egregious and unreasonable that . . . no reasonable [official] could have thought he was acting lawfully.'" *Reed*, 906 F.3d at 547 (quoting *Abbott v. Sangamon Cnty.*, 705 .3d 706, 724 (7th Cir. 2013)). Outrageous conduct "obviously will be unconstitutional." *Safford Unified Sch. Dist. No. 1 v. Redding*, 557 U.S. 364, 377 (2009). "But even as to action less than an outrage, 'officials can still be on notice that their conduct violates established law . . . in novel factual circumstances.'" *Id.* at 377–78 (alteration in original) (quoting *Hope v. Pelzer*, 536 U.S. 730 (2002)).

Arp does not cite any controlling caselaw from the Supreme Court or Seventh Circuit Court of Appeals addressing circumstances under which an employee was required by law to resign. The most analogous case the Court could find is *Patterson v. Portch*, 853 F.2d 1399 (7th Cir. 1988), in which the Seventh Circuit discussed whether the plaintiff's "constructive" resignation entitled him to due process. *Patterson v. Portch*, 915 F.2d 1575, at *1 (7th Cir. 1990). Patterson, the plaintiff,

was a professor at a Wisconsin state college.  After no students enrolled in his courses, the college administration assigned him to noninstructional projects.  *Patterson*, 853 F.2d at 1402.  Patterson refused to accept the noninstructional projects and, as a result, stopped reporting to work.  The administration notified Patterson that if he failed to report for work, he would be deemed to have resigned.  In response, Patterson stated he was willing and available to teach, but that he would not accept other duties.  The administration then notified Patterson that it was treating his continued absence as a resignation.  Patterson requested a formal hearing regarding the resignation, which was denied.  *Id.*  Patterson filed suit under § 1983, alleging the administrators violated his procedural due process rights.

In determining whether Patterson was fired or resigned for due process purposes, the Seventh Circuit began its analysis by describing the "four separate forms of job termination": (1) outright discharge; (2) coerced resignation, typified by an employer threatening to file criminal charges against an employee if he does not resign; (3) constructive discharge, typified by an employer making life "so unbearable for the employee that the employee resigns"; and (4) constructive resignation, which is a form of voluntary resignation. The Seventh Circuit focused on whether Patterson's termination was a constructive discharge, which does require process, or a constructive resignation, which does not.

Constructive resignation is '[n]ormally used to refer to situations in which the employee abandons (without formally resigning) his job and the employer treats the employee as if he had formally resigned." *Id.* at 1406. However, as the *Patterson* court explained, "constructive resignation" is not limited to those circumstances.  For example, the court stated "that if Patterson had defected to the Soviet Union, [the administration] could have treated this as an abandonment of employment, equivalent for constitutional purposes to a voluntary resignation and therefore not

16

requiring a hearing." *Id.*; *cf. Bean v. Wis. Bell, Inc.*, 366 F.3d 451, 454–55 (7th Cir. 2004) (citing Wisconsin's test for classifying constructive resignation—"namely whether the employee engages in 'conduct inconsistent with the continuation of the employee-employer relationship'"). Ultimately, the Seventh Circuit agreed with the district court that the administration's specific conduct was more similar to a constructive discharge than a constructive resignation. *Patterson*, 853 F.2d at 1407 (stating defendants' conduct was "more accurately characterized as discharging an employee over an employment dispute than as declaring the resignation of an employee who simply had abandoned his employment or not shown up for work"); *see Patterson*, 915 F.2d 1575, at *1 ("No doubt as a matter of legal logic, and perhaps even more common sense, if it amounts to firing an employee to make life so unbearable that he quits, it amounts to firing him if you give him unreasonable work orders and then when he fails to show up to carry them out you treat him as having quit."). Patterson's termination was therefore considered involuntary and entitled him to pre-termination processes and procedures.

Though *Patterson* is certainly instructive as to whether Arp's termination was closer to an involuntary discharge than a voluntary resignation, *Patterson* is not analogous enough to have "clearly established" that in this case, Arp was entitled to process before termination of his employment status. Based on the Seventh Circuit's discussion in *Patterson*, Arp's acceptance of an elected office, which triggers a statute requiring him to resign, might be considered a voluntary "constructive resignation." The Court cannot find any other controlling precedent addressing a situation factually analogous to the one presented here, nor can the Court find a clear consensus among other jurisdictions on this issue. *See Terban v. Dep't of Energy*, 216 F.3d 1021, 1023 (Fed. Cir. 2000) ("[I]t is well-established that the mere fact that an employee is faced with an inherently unpleasant situation or that his choices are limited to unpleasant alternatives does not make his

decision involuntary."); *Hammon v. DHL Airways, Inc.*, 165 F.3d 441, 448 (6th Cir. 1999) (defining constructive resignation under Ohio law as failure to comply with employer's written request or abandonment of position via extended absence); *Evangelista v Inlandboatmen's Union of Pacific*, 777 F.2d 1390, 1396 (9th Cit. 1985) ("[B]y seeking and accepting employment with another employer during a supposed leave of absence, Evangelista impliedly resigned . . . ."); *Ling v. Herrod*, 445 F. Supp. 2d 892, 898 (W.D. Tenn. 2006) (rejecting Wisconsin and Ohio's testes for constructive resignation and finding that professor did not constructively resign from position as professor at college of medicine by resigning from medical group, despite contract stating that all professors must practice through medical group as a condition of employment). Further, the ISP Officials' conduct in this case was not so egregious that they could not have reasonably believed that their conduct was constitutional, and Arp does not argue as much.

Accordingly, as of January 1, 2019, the law had not clearly established that deeming an employee to have resigned once that employee becomes required by law to resign is a form of involuntary termination that entitles the employee to pre-termination processes and procedures. Because Arp's entitlement to process before termination of his employment status was not clearly established by January 1, 2019, Defendants are entitled to qualified immunity.

Arp likewise does not defeat Defendants' qualified immunity defense as to the termination of his LTD benefits.  In his response brief, Arp argues that "ISP Defendants offer *no* justification for their failure to afford [him] any procedural protections in connection with the termination of his LTD Benefits, [so his] assertion that the termination violated his due process rights is undisputed. " (Filing No. 90 at 33 (emphasis in original).)  The Court cannot simply deem the issue undisputed because Defendants do not bear the burden of proving their qualified immunity defense. "Although qualified immunity is an affirmative defense, the plaintiff has the burden of

defeating it once the defendants raise it." *Archer v. Chisholm*, 870 F.3d 603, 613 (7th Cir. 2017). Because Arp fails to develop any arguments opposing Defendants' assertion of qualified immunity as to termination of the LTD benefits, the ISP Officials are entitled to qualified immunity.

But even based on the Court's own research, Arp could not have overcome the qualified immunity defense as to Arp's LTD Benefits. The Court could find no caselaw or other authority clearly establishing that an individual is entitled to due process before the termination of his disability benefits, separate from and in addition to any process due before termination of his employment. In other words, the law at the time did not clearly establish that Arp had a protected property interest in his LTD disability benefits once his employment with ISP ended. Indeed, one of the central issues in this case is whether Arp had a protected interest in his LTD benefits after he separated from ISP, and the parties agree that the issue is a matter of first impression. Arp has not shown a violation of his clearly established constitutional right[5] to due process before termination of his LTD benefits.

Unsurprisingly, the law in this area was not clearly established as to place the ISP Officials on notice that their actions were clearly unconstitutional. The ISP Officials are entitled to qualified immunity against Arp's § 1983 claim.

## B.    Arp's State Law Claims

Arp also asserts claims for unlawful termination of employment, breach of contract, unlawful termination of benefits, breach of fiduciary duty, and violations of the Indiana Constitution, all of which are rooted in Indiana law. Because Arp's federal claim has been dismissed, the Court must determine whether it is appropriate to continue to exercise supplemental jurisdiction over the state law claims.

---

[5] The Court's analysis is limited to Arp's due process rights under the United States Constitution. The Court does not reach Arp's claims under the Trust Agreements, Indiana law, or the Indiana Constitution.

The Court has discretion whether to exercise supplemental jurisdiction over a plaintiff's state law claims. *Carlsbad Tech., Inc. v. HIF Bio, Inc.*, 556 U.S. 635, 639 (2009); *see* 28 U.S.C. § 1367(c) ("The district courts may decline to exercise supplemental jurisdiction over a claim . . . if . . . the district court has dismissed all claims over which it has original jurisdiction . . . ."). When deciding whether to exercise supplemental jurisdiction, "'a federal court should consider and weigh in each case, and at every stage of the litigation, the values of judicial economy, convenience, fairness, and comity.'" *City of Chicago v. Int'l Coll. of Surgeons*, 522 U.S. 156, 173 (1997) (quoting *Carnegie-Mellon Univ. v. Cohill*, 484 U.S. 343, 350 n.7 (1988)).

"Normally, when all federal claims are dismissed before trial, the district court should relinquish jurisdiction over pendent state-law claims rather than resolving them on the merits." *Sharp Elecs. v. Metro. Life Ins.*, 578 F.3d 505, 514 (7th Cir. 2009) (citation and quotation marks omitted). Exceptions to the general rule exist: "(1) when the statute of limitations has run on the pendent claim, precluding the filing of a separate suit in state court; (2) substantial judicial resources have already been committed, so that sending the case to another court will cause a substantial duplication of effort; or (3) when it is absolutely clear how the pendent claims can be decided." *Davis v. Cook Cnty.*, 534 F.3d 650, 654 (7th Cir. 2008) (internal quotation omitted).

The Court finds that none of the exceptions apply to Arp's state law claims, and the Court sees no reason to deviate from the "usual practice" of relinquishing supplemental jurisdiction over state law claims. *Groce v. Eli Lilly & Co.*, 193 F.3d 496, 501 (7th Cir. 1999). The statute of limitations will not have run on Arp's state law claims, as both federal and state law toll the relevant limitations period when claims are pending in a civil action (except in limited circumstances not present here). 28 U.S.C. § 1367(d); Ind. Code § 34-11-8-1; *see also Hemenway v. Peabody Coal Co.*, 159 F.3d 255, 266 (7th Cir. 1998). Additionally, the Court has not expended significant

resources on the pending state-law claims. Only one other dispositive motion has been ruled on

in this action, Defendants' Partial Motion to Dismiss (Filing No. 52), and that motion related only

to Arp's § 1988 claim[6]. And to the extent the parties have conducted discovery, those efforts can

be duplicated in state court with relative ease. Further, it is not absolutely clear how the pendent

state law claims should be decided. Arp's claims raise several issues under Indiana law, including

issues of first impression[7] regarding interpretation of the Trust Agreements, ISP regulations, and

several Indiana statutes, including the Indiana Tort Claims Act. As shown by both the number and

novelty of these issues, Arp's claims cannot be resolved with absolute certainty. They should be

decided by an Indiana state court.

And lastly, as always, comity favors allowing state courts to decide issues of state law. The

remaining state law claims raise complex, nuanced issues regarding the interpretation of ISP

pension agreements—which are established and governed by Indiana law—Indiana statutes, and

ISP policies. These are quintessential state law issues that are best resolved by state courts. This

consideration weighs strongly in favor of remand. *See* 28 U.S.C.(s) 1367(c)(1) ("The district

courts may decline to exercise supplemental jurisdiction over a claim . . . if . . . the claim raises a

novel or complex issue of State law . . . ."). On this point, the Seventh Circuit's decision in *Wentzka*

*v. Gellman,* 991 F.2d 423 (7th Cir. 1993) is particularly instructive, holding that a district court

*abused its discretion* by retaining jurisdiction over a case where state law was unsettled. *Id.* at 425

(emphasis added) ("Nor have we found any other extraordinary circumstances which would lead

us to believe that the retention of jurisdiction was necessary in this instance. To the contrary, we

---

[6] Defendants moved to dismiss Trooper Arp's Section 1983 claim as barred by the applicable two-year statute of limitations and Trooper Arp has failed to allege his claim against the Individual Defendants. *See* (Filing No.52).

[7] The parties agree that this is "a case of first impression" for ISP, as Arp was the first ISP employee on long-term disability status to be elected to a full-time elected position (Filing No. 86 at 2; *see* Filing No. 83 at 16). Additionally, it appears that no Indiana court has had occasion to interpret Indiana Code § 10-11-2-12(d) or ISP's Regulation 6.

can identify one very good reason why the district court should not have reached the merits of plaintiffs' common law misrepresentation claims . . . the unsettled nature of Wisconsin law in the area of justifiable reliance.").  In other words, the questions at issue are not the type of "no brainers" that would compel this Court to retain jurisdiction.  *See Martin v. Ind. State Police,* 537 F.Supp.2d 974, 989 (S.D. Ind. 2008) (stating that unless remaining state claims are "no brainers," the "court's duty of comity toward Indiana courts in developing Indiana law directs the court to remand all state law claims to the state courts").

In sum, the application of the *Carnegie-Mellon* factors, coupled with the presumption of relinquishment, leads to the conclusion that Arp's state law claims should be remanded.  The parties' cross-motions are therefore **denied** as to Arp's state law claims. The Court relinquishes supplemental jurisdiction over those claims and **remands** them to the Indiana state court.

## IV.   CONCLUSION

For the reasons discussed above, Arp's Motion for Summary Judgment (Filing No. 80) is **DENIED**, and Defendants' Cross-Motion for Summary Judgment (Filing No. 84) is **GRANTED in part and DENIED in part**.  Summary judgment is **granted** in favor of Defendants and against Arp as to Arp's § 1983 claim, and that claim is **DISMISSED with prejudice**.  The parties' Cross-Motions for Summary Judgment as to Arp's remaining state law claims, are both **denied without prejudice** and **REMANDED** to state court.

**The Clerk is directed to remand** this matter to the Marion Superior Court 5, Cause No. 49D05-1911-PL-049888, and to **close** this federal action.

**SO ORDERED**.

Date:    7/31/2023

Hon. Tanya Walton Pratt, Chief Judge
United States District Court
Southern District of Indiana

DISTRIBUTION:

Anthony Scott Chinn
FAEGRE DRINKER BIDDLE & REATH LLP (Indianapolis)
scott.chinn@faegredrinker.com

Liam Williams
FAEGRE DRINKER BIDDLE & REATH LLP
liam.williams@faegredrinker.com

Stephanie L. Gutwein
FAEGRE DRINKER BIDDLE & REATH LLP (Indianapolis)
stephanie.gutwein@faegredrinker.com

Adam Jeffery Strahan
LEWIS AND WILKINS
strahan@lewisandwilkins.com

Eric Ryan Shouse
LEWIS AND WILKINS LLP
shouse@lewisandwilkins.com

Joshua Thomas Martin
LEWIS AND WILKINS LLP
martin@lewisandwilkins.com